**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1876-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SHAWNTEE D. MITCHELL,

    Defendant-Appellant.

_____

> Submitted January 9, 2024 – Decided February 6, 2024
>
> Before Judges Whipple, Enright and Paganelli.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 16-04-0286 and 16-04-0288.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Margaret Ruth McLane, Assistant Deputy Public Defender, of counsel and on the briefs).
>
> William A. Daniel, Union County Prosecutor, attorney for respondent (Milton Samuel Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Shawntee Mitchell appeals from an October 6, 2017 order denying his suppression motion. He also challenges his aggregate ten-year sentence under a January 26, 2018 judgment of conviction. We affirm.

I.

We glean the facts from the motion record. In October 2015, the Union County Prosecutor's Office (UCPO) commenced a wiretap investigation targeting Kalil Cooper, a suspected leader of the Grape Street Crips in Elizabeth. During the investigation, the UCPO intercepted numerous calls between Cooper and a man named "Body," later identified as defendant.

In certain intercepted conversations, the UCPO heard Cooper and defendant talk about expanding their drug distribution into North Carolina, where defendant lived. Cooper and defendant also discussed the fact defendant had an associate who stole defendant's "drug stash," and defendant wanted Cooper to come to North Carolina and hire someone to kill this associate.

Further investigation revealed Cooper visited defendant in North Carolina and that the number being used by "Body" was linked to a Facebook page of someone named "Sean Mitchell." Sergeant Gary Webb, of the UCPO, entered "Body's" phone number into an intelligence database system and discovered the

number was not only involved in a separate investigation being conducted by the Wake County Sherriff's Department in North Carolina, but was a phone number being used by Shawntee Mitchell.

On December 18, 2015, Webb received a phone call from Officer Jeffrey McClamb of the Wake County Sheriff's Department, informing Webb that defendant would be traveling to New Jersey. Based on this tip, Webb searched the Facebook account linked to Mitchell's number. On December 19, 2015, Webb learned the user of that Facebook account posted a "check in" at the Belleville Motor Lodge. Accordingly, Webb asked Detectives Alex Lopez and Nick Bruno to go to the motor lodge to see if defendant was there.

Detective Bruno found defendant at the motor lodge, standing by a black Buick Enclave with Georgia license plates. Although Detective Lopez was not at the scene at the time, he made a "ghost call"[1] to defendant's phone number. Once the ghost call was placed, Detective Bruno saw defendant answer his

---

[1] As the trial court explained in its October 6, 2017 oral opinion, a ghost call

> is a method of identification used when officers have a lead o[n] who is using a particular cell phone. When officers are conducting surveillance and have a visual of a suspect[,] they will place a call to the phone number they are investigating . . . to observe the suspect answer the phone . . . to identify the user.

A-1876-20

cellphone and hang up the phone at the same time Detective Lopez ended his call to defendant's phone. Detective Lopez confirmed the voice he heard on the ghost call was the same voice he heard during the wiretap investigation. Defendant then left the motor lodge parking lot and because Detective Bruno was by himself, he did not follow defendant.

The next day, Sergeant Webb went to the Belleville Motor Lodge to surveil defendant. About an hour after Webb arrived at the motor lodge, he saw the same Buick Enclave Detective Bruno spotted the day before, but Webb was unsure if one of the people exiting the vehicle was defendant. Some twenty minutes later, Webb saw six people, including defendant, get into the Buick Enclave and drive off. Webb followed the vehicle and contacted Detective Lopez and Detective Anthony Reimer to join in on the surveillance.

Webb, Lopez, and Reimer followed the Buick Enclave for approximately ninety minutes, with each officer driving his own vehicle. At one point, the Buick Enclave stopped at a gas station and Detective Reimer saw what he thought was a blunt being passed around between the occupants of the vehicle.

Once the Buick Enclave left the gas station, it entered the Garden State Parkway and headed southbound. As Webb followed directly behind the vehicle, he became concerned it was headed back to North Carolina.

4

Accordingly, he contacted a Union County Assistant Prosecutor to discuss arresting defendant based on the information gleaned from the wiretap investigation. Webb also called a State Police officer who was assigned with Webb to the wiretap investigation. Webb wanted the State Police to effectuate a motor vehicle stop because he, Lopez, and Reimer were driving unmarked cars. Once the Buick Enclave entered the New Jersey State Turnpike and continued heading southward, Webb contacted an officer at the Cranbury station and successfully arranged to have a State Trooper effectuate the stop.

Once the Buick Enclave was pulled over, Detective Lopez and the trooper went to the driver's side of the vehicle, and Webb and Reimer went to the passenger side. Webb ordered defendant, who was sitting in the front passenger's seat, out of the car. Webb immediately arrested and searched defendant after he exited the vehicle. While Webb was standing next to the vehicle, he smelled a strong odor of burnt and raw marijuana, which he had not smelled until he opened the car door. The rest of the passengers were then ordered out of the car and Webb returned to the vehicle, where he found a handgun underneath a sweatshirt in the middle portion of the vehicle. The remaining passengers were then placed under arrest and searched. Various types of cigars were found in the car, but no marijuana or drug paraphernalia was

recovered.

In 2016, defendant and twenty-one co-defendants were charged with various offenses under Indictment No. 16-04-0286. Defendant was charged with first-degree racketeering, N.J.S.A. 2C:41-2(c) (count one); first-degree conspiracy to commit racketeering, N.J.S.A. 2C:41-2(d) (count three); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3 (count six); and third-degree conspiracy to distribute a controlled dangerous substance, N.J.S.A. 2C:5-2 and 2C:35-5 (count twenty-three). He was separately charged with second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b) under Indictment No. 16-04-00288.

Defendant moved to suppress the handgun recovered from the Buick Enclave. In September 2017, the trial court conducted a hearing on the motion. Sergeant Webb was the only testifying witness. On October 6, 2017, the judge entered an order denying the suppression motion. In her accompanying oral opinion, the judge found the warrantless search of the Buick Enclave was lawful. She explained "Webb had reasonable suspicion that an occupant of the Buick was subject to seizure for a violation of law" based on the 2015 wiretap investigation. The judge also noted the investigation revealed defendant "and Cooper were engaging in daily conversations regarding talk of expanding

Cooper's drug distribution network down to . . . the North Carolina area and how they could make good money selling drugs there." Additionally, the judge credited Webb's testimony that defendant was heard during a wiretapped conversation saying one of his associates had stolen defendant's drug stash and defendant "wanted to have Cooper come down to North Carolina and kill who[m]ever it was that s[tole] the drugs."

In describing the surveillance undertaken by Webb and other officers in December 2015, the judge found "Webb possessed . . . probable cause to . . . arrest [defendant] for conspiracy to commit murder," on the day of his arrest. She further concluded Webb "was fully aware of the content of the conversations between [defendant] and Cooper, primarily dealing with drugs and requests by [defendant] to have the person who stole the drugs . . . murdered." The judge also found "[t]his information alone was enough for Sergeant Webb to stop the vehicle, knowing that an occupant of the Buick, [defendant], was subject to seizure for a violation of law, stemming from the information gained during the wiretap investigation." She further noted "Webb identified [defendant] from a photo and watched [defendant] enter the front passenger seat of the Buick."

Although the judge did not credit Webb's testimony that he could smell marijuana coming from the Buick Enclave as he followed the Buick down the

Parkway, she did not find he "intentionally lied to the [c]ourt" in making this statement. On the other hand, she credited Webb's testimony that after stopping the Buick, Webb opened the front passenger side door and "smelled a strong odor of . . . both burnt and raw marijuana." The judge found Webb had "experience doing controlled burns in the Police Academy and transporting raw marijuana," which could cause "a car [to] smell for up to two days." Therefore, she concluded "it [wa]s possible for the occupants [of the Buick] to have . . . smoked earlier in the day [of their arrest], leaving the smell described by Sergeant Webb[,] who was close enough to smell it" during the stop.

Additionally, the judge credited Webb's testimony that on the day of defendant's arrest, while Webb and two other detectives followed the Buick Enclave for about ninety minutes, occupants of the car "could have discarded any marijuana residue or delivered or dropped off marijuana" as the car "made several stops." Thus, she found:

> probable cause [to search the car] arose from unforeseeable and spontaneous circumstances. This vehicle was lawfully stopped based on the reasonable suspicion that an occupant of the vehicle was subject to seizure for violation of the law. There is no evidence before this [c]ourt that the officers had advance knowledge that the vehicle [defendant] was in could smell like marijuana until the motor vehicle stop. The smell of marijuana was unforeseen and spontaneous[,] . . . as supported by Sergeant Webb's

testimony that this [wa]s not a planned stop and the only reason he requested the stop was because [defendant] was heading southbound in the direction of North Carolina and [Webb] feared [defendant] was returning home.

Had the stop taken place and there was no smell [of] marijuana[,] it would have been a brief detention of the motor vehicle and its occupants and therefore[,] not unreasonable. Accordingly, the search of this vehicle was proper under the automobile exception.

[(Emphasis added).]

On December 4, 2017, defendant pled guilty to the first-degree charges of racketeering and conspiracy to commit murder, as well as the second-degree weapon charge. During the plea hearing, defendant admitted he was "a member of a criminal enterprise known as the Grape Street Crips," he "engaged in multiple criminal actions on behalf of, and in furtherance of, the Grape Street Crips," and "conspired to murder an individual who had committed a theft." He also testified that on the day of his arrest, before the motor vehicle stop and search occurred, he knew the gun was in the car and he had access to it.

On January 26, 2018, defendant was sentenced to concurrent ten-year prison terms on the racketeering and conspiracy charges, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a concurrent five-year term, subject to a forty-two-month parole ineligibility period on the weapon charge, consistent

with the terms of his plea agreement.  All remaining charges were dismissed.

During sentencing, the judge analyzed the applicable aggravating and mitigating factors, and addressed defense counsel and defendant directly as she explained her analysis, stating:

> I do find [a]ggravating [f]actor [number three], the risk that this defendant will commit another offense.  I find that based on his prior drug and alcohol use, [and] . . . based on prior crimes [of a] similar . . . nature, namely drug offenses, which are also involved here as the basis for the racketeering.
>
> I find [a]ggravating [f]actor [number six], the prior criminal record of this defendant and the seriousness [of] the offenses for which he's been convicted. . . .  It appears . . . you do have prior felony convictions . . . for drug sales . . . .
>
> . . . [T]here is no doubt that at least on one occasion[,] you have been convicted of a felony in the State of North Carolina . . . .  And I also note that you have previously violated probation. . . .
>
> . . . I also find [a]ggravating [f]actor [number nine], the need to deter this defendant and others from violating the law.  I don't think there's any doubt that engaging in drug distribution, possession of a handgun, and . . . the conspiracy part of this, . . . . there is, obviously, a need to deter that kind of activity . . . .

In addressing the mitigating factors argued by defense counsel, the judge stated:

[R]egarding [m]itigating [f]actor [number seven], no prior criminal activity, I am not inclined to find that mitigating factor. This defendant does have, from what I can see, misdemeanors in the State of North Carolina, as well as [a] felony conviction. . . .

Mitigating [f]actor [number nine], the character and attitude of this defendant indicate that he is unlikely to commit another offense. The defense is asking me to consider that. I am not inclined to find that mitigating factor. I think that while [defendant is] making positive changes in his life[,] and . . . all the things that he's doing—the anger management with progressive thinking, the [Narcotics Anonymous] and the [Alcoholics Anonymous programs]—it's difficult for this court to find that . . . [defendant's] character and attitude indicate that he's unlikely to commit another offense when you look at the entire picture in this matter.

Regarding [m]itigating [f]actor [number eleven], that the imprisonment of this defendant would entail an excessive hardship to himself or his dependents[, w]hile I certainly agree that there will be hardship to his family, . . . I do not find that there are circumstances here th[at] exceed any hardship that would be[fall] . . . any other person who has a family who is going to be going to State [p]rison, so I am not inclined to find that [m]itigating [f]actor.

So[,] this court finds that [a]ggravating [f]actors [three, six] and [nine] outweigh the [m]itigating [f]actors, which are non-existent. . . . and although a greater sentence can be imposed, I will give . . . defendant the benefit of this plea agreement . . . .

Finally, the judge rejected defendant's request that he be sentenced in the

second-degree range for his first-degree offenses.  She informed defendant:

> [B]ecause [defense counsel] has asked me to sentence you a degree lower, . . . to do that I have to be clearly convinced that the [m]itigating [f]actors substantially outweigh the [a]ggravating [f]actors, and the interests of justice demands it. . . .  Since I do find that the [a]ggravating [f]actors outweigh the [m]itigating [f]actors I don't get to that argument, and I don't think sentencing you a degree lower under these circumstances is appropriate . . . .

In December 2019, defendant filed a petition for post-conviction relief (PCR), alleging in part, that plea counsel was ineffective for failing to file a direct appeal after defendant was sentenced.  The same judge who sentenced defendant partially granted his petition, finding defendant was entitled to limited relief based on plea counsel's failure to file a timely direct appeal.  The judge ordered that defendant be allowed to file a direct appeal within forty-five days and dismissed his remaining claims without prejudice.  In April 2021, we granted defendant's motion to file his notice of appeal as within time.

## II.

On appeal, defendant raises the following arguments:

POINT I

THE POLICE IMPROPERLY EVADED THE WARRANT REQUIREMENT BY SITTING ON PROBABLE CAUSE RATHER THAN SEARCHING

12

THE CAR IMMEDIATELY. IN THE ALTERNATIVE, THE POLICE LACKED PROBABLE CAUSE TO SEARCH THE CAR.

POINT II

THE TRIAL COURT ERRED IN ITS ASSESSMENT OF AGGRAVATING AND MITIGATING FACTORS AND IN FAILING TO FIND THAT THE INTERESTS OF JUSTICE REQUIRED A DOWNGRADE.

These arguments are unavailing.

We begin with the principles that guide our analysis. An appellate court must uphold a trial court's findings on a suppression motion if they are supported by "sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). This deference is applicable regardless of whether there was a testimonial hearing, or whether the court based its findings solely on its review of documentary evidence. State v. Johnson, 42 N.J. 146, 161 (1964); State v. S.S., 229 N.J. 360, 381 (2017). We typically will not reverse a trial court's findings of fact unless the findings are clearly erroneous or mistaken. S.S., 229 N.J. at 381. But a trial court's legal conclusions are reviewed de novo. State v. Dorff, 468 N.J. Super. 633, 644 (App. Div. 2021) (citing S.S., 229 N.J. at 380).

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012). "[S]earches and seizures

conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid." State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Elders, 192 N.J. 224, 246 (2007)). To overcome the presumption that a warrantless search is unlawful, "the State bears the burden of proving by a preponderance of the evidence not only that the search or seizure was premised on probable cause, but also that it 'f[ell] within one of the few well-delineated exceptions to the warrant requirement.'" State v. Bryant, 227 N.J. 60, 69-70 (2016) (alteration in original) (quoting State v. Johnson, 193 N.J. 528, 552 (2008)). "One such exception is the automobile exception." State v. Witt, 223 N.J. 409, 422 (2015).

"To lawfully stop a motor vehicle, 'a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense.'" State v. Nyema, 465 N.J. Super. 181, 190 (App. Div. 2020) (quoting State v. Scriven, 226 N.J. 20, 33-34 (2016)). Moreover, "an investigatory stop is permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" Ibid. (quoting State v. Chisum, 236 N.J. 530, 545-46 (2019)). The reasonable suspicion inquiry considers the officers'

background and training, and permits them "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Probable cause "requires 'a practical, common sense determination whether, given all of the circumstances, there is a fair probability that contraband or evidence of a crime will be found.'" State v. Myers, 442 N.J. Super. 287, 301 (App. Div. 2015) (quoting State v. Moore, 181 N.J. 40, 46 (2004)).

At the time of defendant's arrest, New Jersey courts recognized "that the smell of marijuana itself constitute[d] probable cause that a criminal offense ha[d] been committed and that additional contraband might be present." State v. Walker, 213 N.J. 281, 290 (2013)[2] (quoting State v. Nishina, 175 N.J. 502, 515-16 (2003) (holding that smell of burnt marijuana on driver's person constituted probable cause "a criminal offense ha[s] been committed" and that

_____

[2] Pursuant to the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J.S.A. 24:61-31 to -56, which became effective on February 22, 2021, an odor of marijuana cannot create reasonable suspicion or probable cause to conduct a warrantless search. N.J.S.A. 2C:35-10c(a).

A-1876-20

the vehicle may contain "additional contraband")). The strength of the odor was irrelevant for purposes of establishing probable cause. State v. Judge, 275 N.J. Super. 194, 201 (App. Div. 1994).

In Witt, our Supreme Court "announced . . . a sharp departure from a more narrow construction of the automobile exception the Court had previously adopted in State v. Pena-Flores, 198 N.J. 6 (2009), and in State v. Cooke, 163 N.J. 657 (2000)." State v. Rodriguez, 459 N.J. Super. 13, 21 (App. Div. 2019). The Witt Court acknowledged "the unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile," and "the unanticipated circumstances that give rise to probable cause occur swiftly." Witt, 223 N.J. at 431 (quoting Cooke, 163 N.J. at 672). Thus,

> [i]n the aftermath of Witt, the current law of this State now authorizes warrantless on-the-scene searches of motor vehicles in situations where: (1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous.
>
> [Rodriguez, 459 N.J. Super. at 22 (citing Witt, 223 N.J. at 447-48).]

Consequently, a warrantless roadside search of a vehicle is permissible under the automobile exception articulated in Alston and Witt where "the

16

circumstances giving rise to probable cause" are "unforeseeable and spontaneous" and the probable cause did not exist "well in advance" of the search. State v. Smart, 253 N.J. 156, 174 (2023). When the Alston/Witt test is satisfied, a law enforcement officer has the discretion to proceed with a warrantless roadside search or impound the vehicle and secure a warrant. Rodriguez, 459 N.J. Super. at 15.

It also is well settled that our "review of a sentencing [judge]'s imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). Under this deferential standard, we "must not substitute [our] judgment for that of the sentencing [judge]." State v. Fuentes, 217 N.J. 57, 70 (2014). Instead, our role is to determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

When sentencing a defendant, "judges first must identify any relevant aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." State v. Case, 220 N.J. 49, 64 (2014). Therefore, in

17

reviewing a trial judge's sentencing decision, we determine "whether the aggravating and mitigating factors found . . . were based upon competent, credible evidence in the record." State v. Yarbough, 195 N.J. Super. 135, 140 (App. Div. 1984). We apply a deferential standard of review unless the trial judge failed to identify relevant aggravating and mitigating factors; merely enumerated them; forwent a qualitative analysis; or provided little insight into the decision. Case, 220 N.J. at 65.

Finally, we recognize "the standard governing the downgrading of a defendant's sentence . . . is high." State v. Megargel, 143 N.J. 484, 500 (1996). In Megargel, our Supreme Court established the following two-part test to justify a downgrade: (1) "[t]he court must be 'clearly convinced that the mitigating factors substantially outweigh the aggravating ones'"; and (2) "the interest of justice demand[s] a downgraded sentence." Id. at 496 (quoting N.J.S.A. 2C:44-1(f)(2)). In applying this test, "the severity of the crime" is "the most . . . important factor." Id. at 500. "The reasons justifying a downgrade must be 'compelling,' and something in addition to and separate from, the mitigating factors that substantially outweigh the aggravating factors." State v. Rice, 425 N.J. Super. 375, 384 (App. Div. 2012) (quoting Megargel, 143 N.J. at 505). "Although the degree of the crime is the focus of the sentence, facts

personal to the defendant may be considered in the sentencing process," such as "a defendant's role in the incident."  Megargel, 143 N.J. at 501.

Governed by these standards, we discern no basis to reverse the October 6, 2017 denial of defendant's suppression motion, nor any grounds to disturb defendant's aggregate sentence.

Here, the same judge presided over defendant's suppression, plea, and sentencing hearings.  As discussed, following the suppression hearing, she found the motor vehicle stop was lawful "based on the reasonable suspicion that an occupant of the vehicle[—defendant—]was subject to seizure for violation of the law."  The judge also concluded probable cause for the search of the Buick was predicated on the marijuana odor detected during a lawful motor vehicle stop to arrest defendant.  Further, she found:

> this [wa]s not a planned stop and the only reason [Webb] requested the stop was because [defendant] was heading southbound in the direction of North Carolina and he feared [defendant] was returning home.
>
> Had the stop taken place and there was no smell [of] marijuana[,] it would have been a brief detention of the motor vehicle and its occupants[,] and therefore [it was] not unreasonable.

In addressing defendant's probable cause arguments, the judge also determined Webb had "experience doing controlled burns in the Police Academy

19

and transporting raw marijuana [where] a car could smell for up to two days." Thus, she credited his testimony "that as he opened the door [of the front passenger seat of the Buick Enclave,] he smelled a strong odor of . . . both burnt and raw marijuana." Critically, she further found "[t]here [wa]s no evidence before th[e c]ourt that the officers had advance knowledge that the vehicle [defendant] was in could smell like marijuana until the motor vehicle stop," and concluded "probable cause [for the search] arose from unforeseeable and spontaneous circumstances."

The judge's factual and credibility findings are well supported on the record and entitled to our deference. Accordingly, we decline to second-guess her legal conclusions regarding the lawfulness of the motor vehicle stop and the search and seizure. Moreover, we agree with the judge that "probable cause [for the search] arose from unforeseeable and spontaneous circumstances" so that the search was valid under the automobile exception to the warrant requirement.

We also reject defendant's sentencing arguments. The record reflects the judge sentenced defendant only after carefully analyzing numerous aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b), including mitigating factors raised by plea counsel. The judge also fully addressed defendant's request to be sentenced in the second-degree range on his first-degree charges.

20

In doing so, she considered and rejected defendant's proposed mitigating factors for the reasons we have cited. She also sufficiently detailed her reasons for findings aggravating factors three (risk of re-offense), six (prior criminal history), and nine (need to deter) applied. N.J.S.A. 2C:44-1(a)(3)(6) and (9) before sentencing defendant consistent with his plea agreement.

Because the judge's findings regarding the applicable aggravating factors and non-existent mitigating factors are supported on this record, we have no reason to disturb her sentencing decision, including her denial of defendant's request for a downward departure under Megargel. In short, we are persuaded the judge adhered to the sentencing guidelines, properly conducted her analysis of the applicable aggravating and mitigating factors, and did not err in imposing a sentence consistent with defendant's plea agreement.

To the extent we have not addressed defendant's remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-1876-20